IN RE: BIGGERS, Two MINOR CHILDREN

No. 8019DC447

(Filed 20 January 1981)

**1. Parent and Child § 1— termination of parental rights — failure to provide reasonable support of foster child — constitutionality of statute**

    The statute permitting the termination of parental rights for failure of the parent to pay a reasonable portion of a child's foster care costs for six months preceding the filing of the petition, G.S. 7A-289.32(4), does not violate the equal protection clause by discriminating among persons similarly situated since it applies to all parents equally and allows due consideration of their specific individual financial circumstances.

**2. Parent and Child § 1— termination of parental rights — constitutionality of statutes**

    Statutes permitting the termination of parental rights if a child is neglected as defined by statute, G.S. 7A-289.32(2), or if the parents fail to pay a reasonable portion of a child's foster care costs for six months preceding the filing of the petition for termination of parental rights, G.S. 7A-289.32(4), are not unconstitutionally vague but are sufficiently definite to be applied in a uniform manner to protect both the State's substantial interest in the welfare of minor children and the parents' fundamental right to the integrity of their family unit.

**3. Parent and Child § 1— termination of parental rights — sufficiency of evidence**

    The trial court properly terminated respondent mother's parental rights in her two children where the evidence supported findings by the court that the children were neglected children within the meaning of G.S. 7A-278(4) and that respondent failed to pay any portion of their foster care costs for more than six months preceding the filing of the petition.

APPEAL by respondent from *Warren, Judge.* Judgment entered 7 December 1979 in District Court, CABARRUS County. Heard in the Court of Appeals 5 November 1980.

The District Court entered an order pursuant to G.S. 7A-289.32 terminating respondent's parental rights to her two minor children.

The petitioner, the Cabarrus County Department of Social Ser⸱ ices, presented the following evidence. On 4 August 1972, Carolyn

Eury, a social work supervisor at the Department, received a letter from the county health department regarding David Biggers, born 13 July 1972. On 22 September 1972, respondent, Mrs. Penny Overcash Biggers, called the Department to inquire about care for her son David. She stated that her husband, Kenneth Biggers, had been abusing the child and that she needed to go to Dorothea Dix Hospital.

Barry Thornburg, another social worker, was assigned to the case by the Department. He observed that the Biggers were having marital difficulties and that Mrs. Biggers had emotional problems. He concluded that Mrs. Biggers was not providing adequate care for her son. At the time, David's grandmother, Mrs. Overcash, often took care of him. A homemaker was appointed to assist Mrs. Biggers in the care of the child. The situation, however, did not improve, and, on 8 November 1972, David Biggers was adjudicated dependent by the District Court and placed in the Department's custody.

Although the Biggers cancelled several visits with David after his placement in foster care, they eventually did see him on 15 December 1972. The next visit was not until 2 May 1974, when the Department allowed David to go home for a full day. During the time of his foster care placement, David's parents had separated, but they were reunited in November 1973, the month in which another child, Wendy Denise, was born.

The Biggers' marital problems quickly resumed, however, and shortly after David's home visit, Mrs. Biggers took an overdose of drugs on 15 June 1974. At the time, Mr. Biggers had been intoxicated for several weeks. Throughout this period, the Department continued to provide supervision for the home. Nonetheless, David was returned to the custody of the Biggers on 25 April 1975.

A year later, the Department received another complaint requesting protective services for the Biggers children. An attempt was made to reduce David's developmental retardation through day care placement. In day care, he made substantial progress and seemed to enjoy himself. Nevertheless, due to David's regular absences caused by his mother's failure to get him ready for the bus each morning, the day care enrollment had to be terminated.

In December 1976, the Department and the local housing authority inspected the Biggers' apartment. The home was infested by pests

---

**In re Biggers**

---

due to unsanitary conditions, debris and garbage. A short time later, Mrs. Biggers again contacted the Department concerning child care services, but she did not complete the application. She was taken to the hospital for another drug overdose on 3 May 1977.

A social worker visited the Biggers' trailer on 19 October 1977. She found that the trailer had not been cleaned up for some time and that there was no heat. A week later, she revisited the home and found Wendy barefoot with a runny nose. On another occasion, she washed the dishes and prepared a casserole for the children's supper.

The Department subsequently filed a petition alleging dependency of the Biggers children and requesting their custody for foster care. The District Court concluded that the children were neglected and granted the Department's petition on 4 November 1977 upon its findings of fact:

> That on or about the 30th day of October, 1977, between 10:00 a.m. and 11:00 a.m., Clyde Dellinger, a Deputy Sheriff of Cabarrus County, was summonsed to a trailer wherein Penny Overcash Biggers and Kenneth Brown Biggers were, and wherein Penny Overcash Biggers, mother of the above named children, lived with the children; that said children were outside in the weather, the temperature being in the low 50's; that said children were dressed light and not in keeping with the weather; that the children had infected ears and throat; that their nose and part of their face was covered with mucous and saliva; that Mrs. Biggers was intoxicated and Mr. Biggers had been drinking; that beer cans were strewn about the trailer and outside; that the refrigerator contained a small amount of food; that pots and pans with dried food were on the floor; that the stove was filthy; that there was the odor of urine present in and about the trailer; that the entire trailer was filthy; that the children had not had a cooked meal in days; that the only food the children had had was food brought in by the father from a quick food establishment; that the only food the mother had given the children was from cans; that the mother has been under psychiatric care for some seven (7) years, and is now being treated by Dr. Kneedler and taking drugs for her condition.

The court ordered Mr. Biggers to pay $25.00 per week for child support

while his children were in foster care.

The Biggers later signed a plan of care agreement with the Department on 22 December 1977. They understood that compliance with the agreement was a condition precedent to the return of the children to their custody. The joint requirements of the agreement were that the Biggers maintain a stable marriage, keep an efficient, clean household and meet with a social worker every two weeks. In addition, Mrs. Biggers agreed to meet with her therapist at the mental health clinic for her nervous condition and drug abuse problem until she obtained a written statement that she no longer needed such counselling. Mr. Biggers also agreed to keep a steady job, pay $25.00 a week for the children's support and continue his therapy for alcohol abuse at the mental health clinic. These conditions were never fulfilled by the Biggers.

Shortly before and after the signing of this agreement, Mrs. Biggers was involuntarily committed to Broughton Hospital due to alcohol abuse and destructive behavior. Thereafter, she failed to keep appointments with her psychologist. On 18 February 1978, the Department's social worker supervisor went to the home of Mrs. Overcash where Mrs. Biggers was staying. Mrs. Biggers was highly intoxicated and urinated on herself. She was also very aggressive and threw a chair at her mother. During the same month, Mrs. Biggers again returned to Broughton Hospital for treatment.

The Biggers only visited with the children on two occasions, 22 December 1977 and 12 January 1978, after their placement in foster care. The next visit was not until eight months later in September. The Biggers separated again in May 1978.

Mrs. Biggers signed another plan of care agreement on 6 October 1978 to establish a basis for the return of the children to her custody. She agreed to meet with her social worker every two weeks, pay $100.00 a month for child support, keep her job at Craftsman Fabrics and obtain a written statement from a psychologist at the mental health clinic that she no longer needed counselling to maintain a healthy home environment. The agreement provided for an evaluation within thirty-one days at which time the Department would decide upon one of the following courses of action: (1) returning custody to Mrs. Biggers; (2) seeking voluntary release of parental rights for adoption; or (3) seeking court action for the termination of parental

rights. Four days after she signed this agreement, Mrs. Biggers was fired from her job at Craftsman Fabrics for refusing to do the work she was assigned to do and cursing her supervisor. Mrs. Biggers did not comply with any of the terms in the agreement.

The Department, therefore, decided to make arrangements for the children's adoption in November 1978. A consent form was mailed to Mrs. Biggers, and one was also sent to Mr. Biggers in California. Mrs. Biggers refused to consent to the adoption plans. The Biggers then visited the children on 19 December 1978 and gave them Christmas presents.

The Department filed this action to terminate parental rights on 9 January 1979. Several witnesses testified that when the children were placed in foster care, they were withdrawn and behind their peers in development. Both initially suffered from severe developmental retardation. Yet under foster care, both demonstrated continuous progress. The sum of the testimony for the Department was that it was in the children's best interests that they be legally cleared for adoption. Mrs. Biggers' psychologist, Tom Moon, testified that he had not seen her since March 1978 and that she did not receive benefit from counselling due to her repeated failures to keep appointments. In Moon's opinion, Mrs. Biggers was not able to cope with the day to day care of children or with her own personal problems, and she used drugs and alcohol to keep from facing them. According to Moon, the likelihood of any change was very remote.

At the end of this evidence, respondent made a motion to dismiss the petition which was denied. Respondent's only evidence was the testimony of Dr. Harding Kneedler, a local physician. He stated that he had treated Mrs. Biggers periodically for the last ten years. He stated that her drug and alcohol abuse began when she was only fifteen years old. Based upon his observations of her within the past year, however, Dr. Kneedler was of the opinion that Mrs. Biggers was no longer suffering from such abuses. He believed that Mrs. Biggers' problems were mainly due to her husband and that she would be able to take care of the children better with him out of the picture. Respondent did not testify. A guardian *ad litem* had been appointed for the minor children, but he did not present any separate evidence on their behalf.

The court granted the petition for termination of parental rights

on 7 December 1979. The pertinent conclusions of law were:

> 1. That the Respondent Penny Overcash Biggers has neglected the children Wendy Denise Biggers and David Brown Biggers and said children are neglected children under G.S. 7A-278(4).
>
> 2. That the Respondent Penny Overcash Biggers has failed for a continuous period of more than six months next preceding the filing of the Petition in this proceeding to pay a reasonable portion of the costs of care for said children while they were in the custody of a county department of social services.
>
> . . .
>
> 4. That it is in the best interest of said children that the parental rights of Penny Overcash Biggers be terminated.

From this judgment, respondent appeals.

*Williams, Willeford, Boger, Grady and Davis, by Samuel F. Davis, Jr., and Forbis and Grossman, by Steven A. Grossman, for petitioner appellee.*

*Johnson, Belo and Plummer, by James C. Johnson, Jr. for respondent appellant.*

VAUGHN, Judge.

Respondent urges reversal of the judgment on two bases: the unconstitutionality of G.S. 7A-289.32 and the insufficiency of the evidence to permit the termination of parental rights under the statute. We disagree with respondent's contentions on both points and affirm.

At the outset, we must consider the inconsistency appearing in conclusion of law number three in which Judge Warren stated that grounds for termination existed "under G.S. 7A-289.32, subsections (1) and (3), as amended by Chapter 669 of the 1979 Session Laws . . . ." Since the amendment repealed subsection (1) of the statute, Judge Warren must have meant to refer to the grounds given in subsections (2) and (4) instead, as evidenced by conclusions of law numbers one and two, *supra.* As only one of seven findings is necessary to order termination under G.S. 7A-289.32, however, we shall disregard conclusion of law number three as surplusage unnecessary to sustain the order. In addition, the 1979 amendment deleted the words "physically" preceding "abused or neglected" in subsection (2). Since that

deletion did not change the meaning of "neglected," which is the relevant portion here, the applicability of the amendment to the proceeding is not raised even though the petition was filed before its effective date. We shall, therefore, proceed with our analysis of the statute as amended.

[1] G.S. 7A-289.32 provides seven grounds upon which parental rights can be terminated. Judge Warren's conclusions of law numbers one and two, *supra,* sufficiently identify two of those grounds as applicable to this case: G.S. 7A-289.32(2) and (4). Respondent contends that the statute is generally unconstitutional because it violates the equal protection clause of the fourteenth amendment of the federal constitution. In this proceeding, however, the only question for our determination is the constitutionality of G.S. 7A-289.32(2) and (4). Though respondent has failed to articulate her constitutional arguments, we have carefully considered her general objections and find them to be of no avail.

Our Supreme Court has explained the scope of constitutional equal protection.

> The equal protection clauses of the United States and North Carolina Constitutions impose upon lawmaking bodies the requirements that any legislative classification "be based on differences that are reasonably related to the purposes of the Act in which it is found." *Morey v. Doud,* 354 U.S. 457, 465, 1 L.Ed. 2d 1485, 1491, 77 S.Ct. 1344, 1350 (1957); *Reed v. Reed,* 404 U.S. 71, 30 L.Ed. 2d 225, 92 S.Ct. 251 (1971); *State v. Greenwood,* 280 N.C. 651, 187 S.E. 2d 8 (1972). Such classifications will be upheld provided the classification is founded upon reasonable distinctions, affects all persons similarly situated or engaged in the same business without discrimination, and has some reasonable relation to the public peace, welfare and safety. *State v. Greenwood, supra; Clark's Charlotte, Inc. v. Hunter,* 261 N.C. 222, 134 S.E. 2d 364 (1964).

In *re Moore,* 289 N.C. 95, 104, 221 S.E. 2d 307, 313 (1976); *Duggins v. Board of Examiners,* 294 N.C. 120, 240 S.E. 2d 406 (1978). Here, only G.S. 7A-289.32(4) would even seem to be susceptible to an equal protection claim. It provides for the termination of parental rights upon the finding that:

> The child has been placed in the custody of a county department of social services, a licensed child-placing

agency, or a child-caring institution, and the parent, for a continuous period of six months next preceding the filing of the petition, has failed to pay a reasonable portion of the cost of care for the child.

The basis for an equal protection claim against this subsection would be that it discriminates against parents, according to their financial circumstances, by authorizing termination of their rights for the economic failure to pay for their child's foster care costs. *See* 70 Colum. L. Rev. 465, 469 n. 28 (1970). Such a claim cannot be sustained because subsection (4) does not make any distinction between parents similarly situated.

G.S. 7A-289.32(4) requires parents to pay a *reasonable* portion of the child's foster care costs, and this requirement applies to all parents irrespective of their wealth or poverty. The parents' economic status is merely a factor used to determine their ability to pay such costs, but their ability to pay is the controlling characteristic of what is a reasonable amount for them to pay. In the instant case, the court considered the parent's ability to pay in deciding what was a "reasonable portion" in the 1977 order awarding custody of the Biggers children to the Department. It found that Mr. Biggers made $100.00 per week and thus ordered him to pay $25.00 per week for his children's support while they were in the Department's custody. Respondent later agreed to pay $100.00 a month for the children's care (plan of care agreement, 6 October 1978). At the time, she was employed at Craftsman Fabrics, and the amount agreed to was surely based upon her ability to pay according to her wages and the needs of the children. Finally, in the termination order itself, the court found that respondent, despite her agreement to do so and her ability to be gainfully employed, had failed to pay *"any sums whatsoever"* for her children's support while they were in foster care for over two years.

All parents have the duty to support their children within their means, and the State, as the *parens patriae* of all children, may enforce that duty to prevent children from becoming public charges. 3 Lee, N.C. Family Law § 229 (3d ed. 1963). In G.S. 7A-289.32(4), the legislature has concluded that a child's best interest is served by a termination of parental rights when his parents cannot provide reasonable support. This statute meets the standard of strict judicial scrutiny, where fundamental rights are involved, under the equal protection

clause. The State undoubtedly demonstrates a compelling interest for the health, welfare and safety of minor children, and this interest is directly related to the purpose of the statute. *See also N.C. Ass'n for Retarded Children v. State of N.C.,* 420 F. Supp. 451 (M.D.N.C. 1976); *In re Johnson,* 45 N.C. App. 649, 263 S.E. 2d 805 (1980). "It certainly is not an unreasonable or arbitrary exercise of the police power for the State to intervene between parent and child where that child is helpless and defenseless and is endangered by parental neglect, inattention, or abuse." In *re Lassiter,* 43 N.C. App. 525, 527, 259 S.E. 2d 336, 337 (1979), *review denied,* 299 N.C. 120, 262 S.E. 2d 6 (1980). In sum, we conclude that G.S. 7A-289.32(4) does not violate the equal protection clause by discriminating among persons similarly situated since it applies to all parents equally and allows due consideration of their specific individual financial circumstances.

[2]    Respondent further argues that G.S. 7A-289.32 is unconstitutionally vague. Our Supreme Court has enunciated the principles of the vagueness doctrine as follows:

> A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law .... Even so, impossible standards of statutory clarity are not required by the constitution. When the language of a statute provides adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges and juries to interpret and administer it uniformly, constitutional requirements are fully met. *United States v. Petrillo,* 332 U.S. 1, 91 L. Ed. 1877, 67 S. Ct. 1538.

In *re Burrus,* 275 N.C. 517, 531, 169 S.E. 2d 879, 888 (1969), *aff'd,* 403 U.S. 528, 91 S. Ct. 1976 (1971) (citations omitted). a statute must be examined in light of the circumstances in each case, and respondent has the burden of showing that the statute provides inadequate warning as to the conduct it governs or is incapable of uniform judicial administration. *State v. Covington,* 34 N.C. App. 457, 238 S.E. 2d 794, *review denied,* 294 N.C. 184, 241 S.E. 2d 519 (1977). Respondent cannot meet this burden with respect to G.S. 7A-289.32(2) and (4).

G.S. 7A-289.32(2) provides that parental rights can be terminated if the child is neglected within the meaning of G.S. 7A-278(4). The applicable definition states that a

> "[n]eglected child" is any child who does not receive proper
> care or supervision or discipline from his parent, guardian,
> custodian or other person acting as a parent, or who has
> been abandoned, or who is not provided necessary medical
> care or other remedial care recognized under State law, or
> who lives in an environment injurious to his welfare, or
> who has been placed for care or adoption in violation of law.

G.S. 7A-278(4). Our Court has not found it difficult to give a precise
meaning to this definition of a neglected child in particular cases by
analyzing the factual circumstances before it and weighing the com-
pelling interests of the State with those of the parents and child. In *re
Cusson,* 43 N.C. App. 333, 258 S.E. 2d 858 (1979); In *re McMillan,* 30
N.C. App. 235, 226 S.E. 2d 693 (1976). *See also In re Yow,* 40 N.C. App.
688, 253 S.E. 2d 647, *review denied,* 297 N.C. 610, 257 S.E. 2d 223
(1979). Viewed in this light, G.S. 7A-289.32(2) is not vague because the
terms used in G.S. 7A-278(4) are given a precise and understandable
meaning by the normative standards imposed upon parents by our
society, and parents are, therefore, given sufficient notice of the types
of conduct that constitute child neglect in this State. *See* 17 Ariz. L.
Rev. 1055, 1070 (1975).

G.S. 7A-289.32(4) is also constitutionally clear. In no uncertain
terms, it permits termination of parents' rights when they do not pay a
reasonable portion of their child's foster care costs for six months
preceding the filing of the petition. In this case, respondent was given
even more specific notice in the plan of care agreement she signed with
the Department on 6 October 1978. She promised to pay $100.00 a
month for child support, and she was aware that the Department
would decide within thirty-one days, among other things, whether to
seek termination of her parental rights. In addition, we have already
indicated that the judge does not have unbridled discretion in deter-
mining what a "reasonable portion" is. As with child support orders,
this determination must be based upon an interplay of "(1) the amount
of support necessary to 'meet the reasonable needs of the child' and (2)
the relative ability of the parties to provide that amount." *Coble v.
Coble,* 300 N.C. 708, 712, 268 S.E. 2d 185, 189 (1980); G.S. 50-13.4(c).

We note that vagueness challenges to similar statutes have been
increasingly made across the nation, but they have been almost uni-
formly rejected. *See* Comment, Application of the Vagueness Doctrine

to Statutes Terminating Parental Rights, 1980 Duke L. J. 336, 341; Day, Termination of Parental Rights Statutes and the Void for Vagueness Doctrine: A Successful Attack on the *Parens Patriae* Rationale, 16 J. Fam. L. 213, 232 (1977-78); 70 Colum. L. Rev. 465, 469 (1970). *But see Davis v. Smith,* 266 Ark. 112, 583 S.W. 2d 37 (1979); *Roe v. Conn.,* 417 F. Supp. 769 (M.D. Ala. 1976); *Alsager v. District Court,* 406 F. Supp. 10 (S.D. Iowa 1975), *aff'd,* 545 F. 2d 1137 (8th Cir. 1976). An "impossible standard of statutory clarity" would be inappropriate in cases involving child care and custody. "What might be unconstitutional if only the parents' rights were involved is constitutional if the statute adopts legitimate and necessary means to protect the child's interests." *State v. McMaster,* 259 Or. 291, 296, 486 P. 2d 567, 569 (1971) (rejecting a vagueness claim to the Oregon statute for termination of parental rights). *Accord,* In*'re Daniel H.,* 591 P. 2d 1175 (Okla. 1979). This context requires flexibility in the weighing of each case's facts in order to give the child, as well as the parent, the highest form of due process. Otherwise, the clear legislative intent of Article 24B would be frustrated:

§ 7A-289.22. Legislative intent; construction of Article. — The General Assembly hereby declares as a matter of legislative policy with respect to termination of parental rights:
(1) The General purpose of this Article is to provide judicial procedures for terminating the legal relationship between a child and his or her biological or legal parents when such parents have demonstrated that they will not provide the degree of care which promotes the healthy and orderly physical and emotional well-being of the child.

(2) It is the further purpose of this Article to recognize the necessity for any child to have a permanent plan of care at the earliest possible age, while at the same time recognizing the need to protect all children from the unnecessary severance of a relationship with biological or legal parents.

(3) Action which is in the best interests of the child should be taken in all cases where the interests of the child and those of his or her parents or other persons are in conflict.

To enforce these policies of Article 24B, we hold that the provisions of G.S. 7A-289.32(2) and (4) are sufficiently definite to be applied in a

uniform manner to protect both the State's substantial interest in the welfare of minor children and the parents' fundamental right to the integrity of their family unit.

**[3]** Respondent makes the final assertion that the evidence was insufficient to support the court's findings of fact in the termination order of 7 December 1979. Respondent, however, did not except to any of those findings as required by Rule 10(b)(1) of the Rules of Appellate Procedure, and does not, in addition, advance any argument in support of this position in her brief. Thus, the only question is whether the findings support the judgment. *City of Kings Mountain v. Cline,* 281 N.C. 269, 188 S.E. 2d 284 (1972). It suffices to say that the Department presented overwhelming and uncontradicted evidence which supports the court's findings that these children were neglected and that their parents had failed to pay reasonable child support for their care. Without question, these findings support the judgment terminating respondent's parental rights. In such circumstances, it is in the children's best interests that parental rights be terminated so that permanent adoptions can proceed to provide them with a secure, capable family. Otherwise, helpless children might be left to "grow up in 'legal limbo' in foster homes at public expense." Thomas, Child Abuse and Neglect, 50 N.C. L. Rev. 293, 341 and n. 173 (1972).

The judgment is affirmed.

Affirmed.

Judges MARTIN (Robert M.) and WELLS concur.