IN RE: RONNIE ODOM WEBB, III

No. 8326DC565

(Filed 18 September 1984)

**Parent and Child § 1— termination of parental rights—sufficiency of evidence of neglect**

 Evidence was sufficient to support the trial court's conclusion that a child was neglected and it was within the discretion of the court as to whether to terminate parental rights where there was evidence that respondents did not understand the importance of proper food for their child and, as a result, he suffered from malnutrition requiring hospitalization on one occasion; respondents did not make an adequate effort to see that their child received prescribed medication; and respondents allowed the child to live in a filthy home. G.S. 7A-289.32. G.S. 7A-517(21).

 Judge BECTON dissenting.

APPEAL by respondents from *Bennett, Judge.* Judgment entered 31 January 1983 in District Court, MECKLENBURG County. Heard in the Court of Appeals 4 April 1984.

The respondents Ronnie O. Webb, Jr. and Mona F. Webb appeal from a judgment terminating their parental rights to Ronnie Odom Webb, III. The Mecklenburg County Department of Social Services petitioned on 22 September 1982 for the termination of these rights on the ground that the respondents had neglected the child as defined in G.S. 7A-517(21) and that for a continuous period of more than six months next preceding the filing of the petition failed to pay a reasonable portion of the cost of care for the child who had been in foster care since November of 1981.

The evidence at the hearing showed the respondents were married on 18 December 1978 at which time Mona F. Webb was fourteen years of age. A daughter has been born to the marriage who is not subject to this proceeding. Ronnie Odom Webb, III was born to the respondents on 5 July 1980. On 5 March 1981 the child was taken by a social worker for the Mecklenburg County Department of Social Services to Charlotte Memorial Hospital where he was admitted and treated for malnutrition. The caseworker testified that Mona Webb did not seem to understand the gravity of the child's condition. The caseworker testified that Mona Webb referred to "Ronnie as 'just a skinny baby,' when in

fact, he had an enlarged head, bloated stomach, skinny, bony extremities . . . ." The Department of Social Services obtained a nonsecure custody order on that date. The child stayed in the hospital for eleven days. On 24 March 1981, the child was held to be neglected as defined by G.S. 7A-517(21). He was placed in a foster home and remained there until 31 July 1981 at which time the court ordered, against the recommendation of the Department, that the child be returned to the respondents for a trial placement.

After the child was returned to the home of the respondents, they enrolled in various courses to help them become better parents. Announced and unannounced visits were made by a caseworker. The respondents were furnished with food stamps because of inadequate food within their home. In October 1981 Ronnie was sick and the respondents told the caseworker the prescription for his medication had been lost. Agents of the Department of Social Services purchased the medication and delivered it to the respondents. On 30 October 1981, a caseworker went to the home and found a strong smell of urine. Ronnie was wet, dirty, and coughing. There was inadequate food in the house. On 13 November 1981 the child was voluntarily returned to foster care. The child visited the parents on occasion until the petition was filed in this case. After the child was returned to foster care, the Department requested $40.00 per month for child support from the respondents but it was determined it would be better to keep this money in the home, and the Department withdrew the request. No contribution was made until the petition was filed. The respondents contributed $125.00 for child support between the filing of the petition and the hearing.

The court found facts based on the evidence and concluded that sufficient grounds existed to terminate the parental rights of the respondents under the provisions of G.S. 7A-289.32(2) and (4). It terminated the parental rights and obligations of the respondents. The respondents appealed.

*Ruff, Bond, Cobb, Wade and McNair, by Robert S. Adden, Jr. and William H. McNair, with Guardian ad litem Ellis M. Bragg joining on the brief; for petitioner appellee Mecklenburg County Department of Social Services.*

In re Webb

*Jordan, Durham and Wilson, by Samuel A. Wilson, III, for respondent appellant Ronnie Odom Webb, Jr.*

*Sheely and Blum, by James Gronquist and Shelley Blum, for respondent appellant Mona F. Webb.*

WEBB, Judge.

G.S. 7A-289.32 provides that a court may terminate parental rights on seven different grounds. The court in this case concluded that two of the grounds for termination existed. These were under subsections (2) and (4) which provide in part:

"(2) The parent has . . . neglected the child. The child shall be deemed . . . neglected if the court finds the child to be . . . a neglected child within the meaning of G.S. 7A-517(21).

. . . .

(4) The child has been placed in the custody of a county department of social services . . . and the parent, for a continuous period of six months next preceding the filing of the petition, has failed to pay a reasonable portion of the cost of care for the child."

G.S. 7A-517(21) provides in part:

"Neglected Juvenile.— A juvenile who does not receive proper care, supervision, or discipline from his parent . . . or who is not provided necessary medical care or other remedial care recognized under State law, or who lives in an environment injurious to his welfare . . . ."

There was evidence that the respondents did not understand the importance of proper food for the infant and as a result, he suffered from malnutrition requiring hospitalization on one occasion. There was also evidence the respondents did not make an adequate effort to see the infant received prescribed medication. There was also evidence the respondents allowed the child to live in a filthy home. The court made findings of fact based on this evidence and concluded the child was neglected as defined in G.S. 7A-517(21). We affirm this conclusion of the court. Having concluded the child was neglected, it was within the discretion of the

court as to whether to terminate the parental rights. We hold the court did not abuse its discretion by so doing.

If the court properly concluded that parental rights should be terminated on any of the seven grounds enumerated under G.S. 7A-289.32, we cannot disturb its judgment. *See In re Biggers*, 50 N.C. App. 332, 274 S.E. 2d 236 (1981). We have affirmed the termination pursuant to subsection (2). We do not pass on the termination pursuant to subsection (4).

The respondent Mona F. Webb contends the court did not adequately consider her efforts to improve herself as a mother after she voluntarily relinquished custody of the child. She also argues that there was evidence that she and her husband had separated and evidence that they were making an effort to reunite which should provide the infant with a good home. Ronnie O. Webb, Jr. argues that the evidence shows his economic condition had improved and this was not taken into account. These were considerations for the district court in exercising its discretion as to termination. When the district court concluded the child was neglected, it was within the court's discretion taking into account the best interests of the child as to whether parental rights should be terminated. *See In re Montgomery*, 311 N.C. 101, 316 S.E. 2d 246 (1984).

The respondents argue that the petitioner has not met its burden of proof which requires that proof of all facts be by "clear, cogent, and convincing evidence." We believe the facts on which the court based its conclusion were virtually not in dispute. Once the court had made this conclusion it was within its discretion as to whether the parental rights should be terminated. The exercise of this discretion is not subject to the burden of proof.

Affirmed.

Judge EAGLES concurs.

Judge BECTON dissents.

Judge BECTON dissenting.

Nothing in the record justifies the irretrievable destruction of the Webb family as set forth in the decretal part of the judgment which follows:

> NOW, THEREFORE, IT IS ORDERED, ADJUDGED and DECREED that all rights and obligations of Mona Rene Webb and Ronnie Odom Webb, Jr., with respect to Ronnie Odom Webb, III, and all rights and obligations of said child with respect to his mother and his father, arising from any biological or legal parental relationship between them be and they are hereby, terminated.

I therefore dissent in both cases, although the case for the father is not nearly as strong as the case for the mother.

In upholding the trial court's decision to terminate parental rights, the majority has, in my view:

1. Erroneously applied the same standard of neglect justifying nonsecure custody orders or temporary removal to termination proceedings by placing undue weight on the initial determination of neglect prior to temporary removal;

2. Unfairly deprived the mother of her rights despite her earnest and successful efforts to meet the requirements imposed by the Mecklenburg County Department of Social Services (DSS);

3. Iniquitously, and in Solomon-like fashion, given the mother the Hobson's choice of keeping her child by severing her relationship with her husband, the child's father;

4. Effectively condoned a "two wrongs make a right" policy, which considers the bonding between child and foster parent resulting from the last placement as most significant, even when a mistake had been made in the initial placement; and

5. Mistakenly analyzed this case as an "exercise of discretion" case when, because the findings are not based on clear, cogent, and convincing evidence, the exercise of discretion question is not presented. Instead, this is an "error of law" case.

I also believe the parents win on the issue not reached by the majority—whether, as a matter of law, the parents, for a con-

tinuous period of six months next preceding the filing of the petition, failed to pay a reasonable portion of the cost of care for the child under N.C. Gen. Stat. § 7A-289.32(4) (1981).

I

POLICY CONSIDERATIONS

A. The family occupies a special and highly revered place in the life of our nation and people. Thus our courts have accorded full constitutional protection to family relationships. "[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Moore v. City of East Cleveland*, 431 U.S. 494, 503-4, 52 L.Ed. 2d 531, 540, 97 S.Ct. 1932, 1938 (1977) (footnotes omitted).

Accordingly, the decision to terminate parental rights may only be made in circumstances in which the parents have been afforded the full protection of process due under our constitutions:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Santosky v. Kramer*, 455 U.S. 745, 753-54, 71 L.Ed. 2d 599, 606, 102 S.Ct. 1388, 1394 (1982).

B. In *Santosky* the Court recognized that in most parental rights cases there is an immense disparity in litigation resources and options between the State and the parents:

> The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predeter-

mined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.

The disparity between the adversaries' litigation resources is matched by a striking assymmetry in their litigation options. Unlike criminal defendants, natural parents have no "double jeopardy" defense against repeated State termination efforts.

455 U.S. at 763-64, 71 L.Ed. 2d at 613, 102 S.Ct. at 1399-1400 (footnote omitted). These factors continue to apply even when, as in North Carolina, the State ensures formal procedural rights such as appointed counsel, notice, right to cross examine, and periodic review. The *Santosky* Court therefore held that parental rights could only be terminated upon the State presenting "clear and convincing" evidence to support its case. North Carolina had already conformed to this standard, requiring, "clear, cogent, and convincing" evidence. N.C. Gen. Stat. § 7A-289.30(e) (1981).

C. What this evidentiary standard *means* remains problematic, however. Our Supreme Court, while conceding that a "clear, cogent, and convincing" standard demands a "stricter degree" of evidence, held that the terms themselves "are not susceptible of separate, analytical comparison with the greater weight of the evidence." *McCorkle v. Beatty*, 225 N.C. 178, 181, 33 S.E. 2d 753, 755 (1945). The Court has declined to elaborate further, merely stating that it falls somewhere between "a preponderance of the evidence" and "proof beyond a reasonable doubt." *In re Nowell*, 293 N.C. 235, 237 S.E. 2d 246 (1977). Brandis suggests that the standard creates "bewilderment" for both

judges and juries. 2 H. Brandis, *North Carolina Evidence* § 213 at 164-65 n. 47 (2d rev. ed. 1982).

The United States Supreme Court has also struggled with the practical effect of the "clear and convincing" standard:

> [T]he ultimate truth as to how the standards of proof affect decisionmaking may well be unknowable, given that factfinding is a process shared by countless thousands of individuals throughout the country. We probably can assume no more than that the difference between a preponderance of the evidence and proof beyond a reasonable doubt probably is better understood than either of them in relation to the intermediate standard of clear and convincing evidence. Nonetheless, even if the particular standard-of-proof catch words do not always make a great difference in a particular case, adopting a 'standard of proof is more than an empty semantic exercise.' [Citation omitted.] In cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.' [Citation omitted.]

*Addington v. Texas*, 441 U.S. 418, 424-25, 60 L.Ed. 2d 323, 330, 99 S.Ct. 1804, 1808-09 (1979).

The solicitude for parental rights apparent in *Santosky* and in our G.S. § 7A-289.30(e) (1981) should be something more than a triumph of semantics. The majority opinion in the present case demonstrates how little more it is.

II

ANALYSIS

A. The majority affirms on the basis that the trial court's finding of neglect is supported by clear, cogent, and convincing evidence. The statutes under which this determination was made, G.S. § 7A-289.32(2) (1981) and G.S. § 7A-517(21) (1981) are set out in the majority opinion. They provide for termination if the parent "*has* abus*ed* or neglect*ed* the child," in other words, if some instance or instances of abuse or neglect has or have occurred *in the past* sufficient to warrant termination of parental rights at the time of the hearing.

The proper length of time between the acts of neglect justifying termination and the termination itself has provoked some judicial controversy. Most notably, in *In re Moore*, 306 N.C. 394, 293 S.E. 2d 127 (1982), *appeal dismissed sub nom. Moore v. Guilford County Dep't of Social Services*, 459 U.S. 1139, 74 L.Ed. 2d 987, 103 S.Ct. 776 (1983), our Supreme Court held rights properly terminated on evidence of neglect that occurred *six years* prior to the hearing. Thereafter the children were placed in foster care, with a clear pattern of parental inattention in the interim. Justice Carlton, joined on this point by Justices Mitchell and Meyer, dissented, arguing that "neglect" as contemplated by the statute means neglect within a reasonable time before the petition, and that any inattention or other failings during the period while the children were in foster care had nothing to do with the statutory grounds of neglect set out in G.S. § 7A-517(21) (1981).

B. Recently, our Supreme Court softened, or at least explained, part of the relevant holding in *In re Moore*. *In re Ballard*, 311 N.C. 708, 319 S.E. 2d 227 (1984). The *Ballard* Court stated that "termination of parental rights for neglect may not be based solely on conditions which existed in the distant past, but no longer exist" and held that, although

> evidence of neglect by a parent prior to losing custody of the child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights . . .[,]
>
> . . .
>
> the trial court erroneously treated the prior adjudication of neglect standing alone as binding upon it and as determinative on the issue of neglect at the time of the termination proceeding.

*In re Ballard*, slip opinion at pp. 8, 9, 311 N.C. 708, 319 S.E. 2d 227 (1984).

In my view, the *Ballard* Court, although it does not expressly say so, recognizes that the invasion of the interest of family autonomy—indeed, privacy—is much more significant in termination proceedings than in temporary removal proceedings. Therefore, the demands of due process should require a greater showing of the State as *parens patriae*. In some respects, the

distinction I suggest is not unlike the "probable cause" (temporary removal) and "guilt" (termination) distinction that are so familiar in criminal procedure.

In short, *Ballard* requires new findings of fact based on "changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *Id.* at p. 8.

C. Marital stress alone is not neglect. The trial court's heavy reliance on the parents' marital stress after the temporary removal (*see* subsection E and Section IV, *infra*) indicates that the trial court's conclusion of "neglect" was based unduly on the initial adjudication of neglect. Even reviewing the evidence cited by the majority as supportive of the conclusion that the child was neglected, one finds that the most significant evidence of neglect — malnutrition requiring hospitalization — occurred before temporary removal. That, on occasions, there was inadequate food in the house, and that on one occasion the parents lost a prescription for medication, constitutes the only post-temporary removal evidence. Moreover, there is no evidence of any neglect after the mother had successfully completed parenting classes provided by DSS. In *Ballard*, the Supreme Court, upon its own review of the record, determined that the trial court treated the prior adjudication of neglect as determinative. Here, the trial court's heavy reliance on pre-temporary removal neglect and its failure adequately to find facts on post-temporary removal neglect based on clear, cogent, and convincing proof constitute error in view of *Ballard*.

D. Even if we were not to consider *Ballard*, *Moore* is distinguishable from the present case. The evidence of the original neglect in *Moore* indicated a pattern of violent and even criminal conduct toward the children on the part of the parents. Such conduct would understandably continue to carry heavy weight with the courts even at some distant time in the future. In contrast, the only thing the original neglect adjudication proves in this case is that the parents were very poor, very young, and very unskilled in parenting, defects which can be cured with time and which, in fact, the mother has made substantial efforts toward curing. For example, consider the first health problem which arose in March 1981. Ronnie, the minor child, was unable to get enough milk from his bottle. After three days of hospitaliza-

tion, it was discovered that he could not suck through a regular nipple because he was premature, and once the nipples were changed, he was able to suck the proper amount of milk. Again, for the above reasons, I find no clear, cogent or convincing evidence of post-temporary removal neglect.

E. The appropriate ground on which the trial court should have decided the case appears to be N.C. Gen. Stat. § 7A-289.32(3) (1981):

> The parent has willfully left the child in foster care for more than two consecutive years without showing to the satisfaction of the court that substantial progress has been made within two years in correcting those conditions which led to the removal of the child for neglect, or without showing positive response within two years to the diligent efforts of a county department of social services, a child-caring institution or licensed child-placing agency to encourage the parent to strengthen the parental relationship to the child or to make and follow through with constructive planning for the future of the child.

The record does contain some evidence that the parents failed to show "substantial progress" in correcting the conditions leading to placement in foster care. The trial judge's comments, in announcing his disposition of the case, clearly reflect that this lack of progress, *as a practical matter*, formed the basis for his order. He noted that two primary problems had existed which made the parents' home unsuitable, (1) poverty and (2) marital stress, and that the money problem was solved at the time of the hearing. He continued:

> The second one has not been solved and by the testimony of every witness who has been on the witness stand will not be solved. The evidence shows clearly that Mona Webb has taken probably as — exerted as much effort and has made as much progress as any parent who has come into this court, but it has been almost entirely unilateral. The evidence shows, even from Mr. Webb's own testimony, that he does not recognize to date that a problem exists in the marriage or that it affects the child or that he has any obligation to deal with it. The testimony of [DSS] confirms what I think the other evidence shows; that if the parents are reunited

without him dealing with that situation, that the problems will continue to exist; that they will lead probably right back to where we were before.

The judge's comments clearly show that his primary concern lay within the ambit of G.S. § 7A-289.32(3) (1981), not G.S. § 7A-289.32(2) (1981).

What the record does not show, and what it cannot possibly show, is that the parents willfully left the child in foster care for more than two consecutive years. Therefore, G.S. § 7A-289.32(3) (1981) could not serve as grounds for termination. What is apparently happening in this case, and what the majority apparently condones, is that DSS is using the neglect ground as a "short cut" to circumvent the two year waiting period established by the General Assembly. Since foster care ordinarily commences upon some showing of neglect or one of the other grounds for termination of rights, the two year period in G.S. § 7A-289.32(3) (1981) can probably be effectively shortened in this manner in the great majority of cases. This is true even in cases such as this one, in which, unlike *Moore*, the culpability of the parents is not extreme and the parents make an effort to correct their problems.

It is elementary that "a statute must be considered as a whole and construed, if possible, so that none of its provisions shall be rendered useless or redundant. It is presumed that the legislature intended each portion to be given full effect. . . ." *Porsh Builders, Inc. v. City of Winston-Salem*, 302 N.C. 550, 556, 276 S.E. 2d 443, 447 (1981); *see also Jolly v. Wright*, 300 N.C. 83, 265 S.E. 2d 135 (1980); 73 Am. Jur. 2d *Statutes* §§ 249-254 (1974). As Judge Wells suggested in his dissenting opinion in *In re Ballard*, 63 N.C. App. 580, 306 S.E. 2d 150 (1983), and as this case clearly shows, the majority's position seriously undermines the effect of G.S. § 7A-289.32(3) (1981). While the current thought among child psychologists may be that two years is too long to leave a child in foster care, they have yet to convince the General Assembly of that proposition. Until they do, the courts must consider termination cases in light of the two-year period established by statute; they err, as does the majority in this case, by using other grounds to cut short that waiting period.

### III

In response to the fifteen-year-old mother's contention that no evidence of neglect, which occurred before she received training in those parenting and marital skills that she lacked, should have been considered at the termination proceedings, DSS argues that "any evidence of her subsequent efforts to correct those conditions which led to the child being neglected is irrelevant to the establishment of neglect as a ground for termination." I disagree. As stated by the mother in her brief:

> [S]he took advantage of the services offered her by the various community agencies to improve her skills of parenting, especially in the non-economic sense, and continued to show love and affection for the child. However, she was not then given an opportunity to put those new skills to the test of reality through an opportunity of custody of the child. After doing all she could do to prepare herself for her role as a mother, she had the door slammed in her face.

In my view, the majority has unfairly deprived the mother of her rights despite her earnest and successful efforts to meet the requirements imposed by DSS.

### IV

Principally on the basis of testimony of social workers suggesting that a "deadly triangle" existed between the mother, the father, and a three-year-old daughter, Elizabeth, who was considered special and who competed with the mother for the affection of the father, the trial court concluded that there were sufficient grounds to terminate parental rights to two-year-old Ronnie, when it found as a fact that the mother *might* resume her marital relationship with the father.

Unquestionably, the mother's relationship with the father played a major role in DSS's decision to file the termination of parental rights petition. The social workers admitted as much. In like fashion, the marital relationship played a predominant role in the trial court's decision to terminate the mother's parental rights: "testimony of the witnesses causes the court to conclude that the stress problem is unlikely to be solved in the reasonable future . . . [and] if the respondent parents are reunited without respondent father's dealing with the marital problems, then the

marital problems will continue to exist and the situations which led to the neglect of the child will most probably reoccur."

The inference is clear. If this had been a custody action between the two parents, the mother would have been awarded custody of the child; but, since she decided to try to save her marriage as well as retain custody of her child, the trial court terminated her parental rights. This type of intrusion into familial privacy may be considered by some as Orwellian Big Brother-ism. After all, this is 1984, and if courts can terminate parental rights because of some perceived effect on a minor child as a result of arguments and fights between parents, a spouse's psychological dependence on the other spouse, a parent's indolence or vices, or the parents' impoverished state, then Orwell may have been right. Big Brother's normative standards and judgment will be given preclusive significance, and there will be only one way to raise a family.

Simply put, I am unable, in this neglect, non-abuse situation, to support the Solomon-like Hobson's choice given the mother by the trial court. DSS has been unable to cite any case which could possibly support such an excessive governmental intrusion into the structure of the family.

V

In finding of fact no. 8, the trial court stated:

That while the child has been in the legal and physical custody of the Department of Social Services, he has been placed in the licensed foster home of Mr. and Mrs. Schlabach; further, that the child has become increasingly attached to his foster family and refers to Mr. and Mrs. Schlabach as 'daddy' and 'mama' respectively; further, that the child continues daily to bond closer to the foster parents; and further, that Mr. and Mrs. Schlabach desire to adopt the child if the child is cleared for adoption.

The trial court did not state what weight it attached to this finding, but DSS argues in its brief that partially "[i]n view of the fact that the child has become increasingly attached to his foster parents, who have expressed a desire to adopt him [,] . . . it is clear that the trial court was acting well within its discretion in concluding that termination of . . . parental rights is within the

best interest of the child." To the extent the trial court and the majority considered bonding to be a determining factor, I express my dissatisfaction with the weight accorded such factor. "[T]he State even has the power to shape the historical events that form the basis for ['bonding' and, therefore] termination." *Santosky*, 455 U.S. at 763, 71 L.Ed. 2d at 613, 102 S.Ct. at 1400. Given the tender ages of the children involved in most of these cases and the length of time it generally takes from temporary removal to termination (in this case it took 2 years and 9 months), bonding between the child and the foster parents is likely to occur and is, therefore, likely to be unduly weighted when balanced against the interest of parents who simply may have been careless, immature, and not mean at all. When the best interest of the child is weighed on the scales of justice, it is wrong to place the heavy thumb of bonding on the side of the foster parents, especially when the parents have not even been given the opportunity to apply admittedly learned parenting skills. There will undoubtedly be many cases in which temporary removal will subsequently be viewed as unfounded, or, indeed, illegal. *See Palmore v. Sidoti*, --- U.S. ---, 80 L.Ed. 2d 421, 104 S.Ct. 1879 (1984). When that occurs, or if the trial court has, in effect, punished parents for their immaturity or has for other reasons made a mistake in an initial placement, it simply compounds the wrongs to say that bonding is determinative. If two wrongs do not make a right, certainly several wrongs do not. Bonding, in this case, in no way justifies the irretrievable destruction of the Webb family.

## VI

As suggested above, this case involves a misapplication of law. The majority's "exercise of discretion" analysis is, therefore, in my view, mistaken. Even if, *arguendo*, the law has not been misapplied, DSS did not prove by clear, cogent, and convincing evidence the existence of one or more of the grounds for termination listed in N.C. Gen. Stat. § 7A-289.32 (1981).

## VII

The majority does not reach the trial court's determination that the parents failed to provide any support in the six months next preceding the filing of the petition, the second ground of termination. G.S. § 7A-289.32(4) (1981). The trial court failed to make explicit findings for each parent of inability to pay. *See In re*

*Phifer*, 67 N.C. App. 16, 312 S.E. 2d 684 (1984) (findings required). More importantly, it failed to resolve the issue whether DSS had excused payment entirely, an omission of particular importance in light of DSS' admission that it excused payment at least partially to keep income in the home. Therefore, I would hold that this finding is also not supported by clear, cogent, and convincing evidence, and accordingly reverse.

CONCLUSION

In my view, the decision of the trial court should be reversed and an order should be entered returning the child to his parents.

I find the trial judge's words themselves most compelling. In announcing his decision to terminate parental rights, the trial judge said:

> I confess that I do that with probably more reluctance in this case than any one I've ever heard.

> The evidence shows clearly that Mona Webb has taken probably as — exerted as much effort and has made as much progress as any parent who has come into this court. . . .