IN THE MATTER OF: PATRICIA ECKARD, a minor child

No. COA00-655

(Filed 19 June 2001)

**Termination of Parental Rights— permanency planning hearing—error to cease reunification efforts**

The trial court erred in a permanency planning hearing by directing the Department of Social Services (DSS) to cease reunification efforts between respondent mother and her minor child, because: (1) every witness at the hearing testified that respondent had done everything she was required to do by the court and DSS to be reunited with her child including attending every class, paying child support, attending scheduled visits with her child, acknowledging her responsibilities, recognizing her errors, and appearing to learn from her mistakes; (2) there is no evidence that the trial court ever found that respondent inflicted the injuries which lead to her child's removal from the home; (3) with the exception of the guardian ad litem, every person whom the court assigned to assess respondent concluded that respondent had made substantial progress towards turning her life around; and (4) DSS recommended that it was in the child's best interest that the goal remain reunification of mother and daughter.

Respondent-mother appeals from order entered 17 December 1999 by Judge Nancy L. Einstein in Catawba County District Court. Heard in the Court of Appeals 28 March 2001.

*M. Victoria Jayne for Petitioner-Appellee Guardian Ad Litem.*

*Nathaniel J. Poovey for Respondent-Appellant Angela B. Eckard.*

TYSON, Judge.

Angela Eckard ("respondent" or "mother") appeals from a "permanency planning order" ("order") ceasing reunification efforts between her and her daughter, Patricia Eckard ("Patricia" or "Tricia"). For the reasons discussed herein, we reverse the order of the trial court.

Facts

On 14 April 1999, respondent went to the grocery store to purchase food for dinner, leaving Patricia, then 22 months old, with her

boyfriend, Dale Hart. Upon returning, respondent noticed bruises and cuts on Patricia, and blood on Mr. Hart. Mr. Hart explained that Patricia had fallen and hit her head on a dresser. Respondent took Patricia to Catawba Memorial Hospital. Doctors diagnosed Patricia as having suffered skull fractures and numerous bruises all over her body. Medical personnel at the hospital concluded that the injuries suffered by Patricia "could not have been caused by accidental means." Respondent consistently maintained that Patricia's injuries were suffered while under Mr. Hart's supervision.

On 21 April 1999, a nonsecure custody order was entered removing Patricia from respondent's home, and placing her in the foster home of Harry and Paulette Sigmon. On 22 April 1999, Catawba County Department of Social Services ("DSS") filed a petition alleging that Patricia was an abused, neglected, and dependent juvenile. On 26 April 1999, respondent entered into a "Memorandum of Agreement and Order" agreeing to the continuation of the nonsecure custody order until adjudication. The Agreement stated that "reasonable efforts will be made to return the child to her home." The agreement was signed by respondent, DSS, the Guardian Ad Litem's Office, and the Honorable Gregory R. Hayes.

On 25 May 1999, the juvenile petition came on for adjudication before the Honorable Nancy L. Einstein. At this hearing, respondent, through her counsel, consented to an adjudication which found that Patricia was an abused, neglected and dependent juvenile. The trial court ordered:

1. The custody of the minor child shall be with the Catawba County Department of Social Services with placement in its discretion; current placement in the Catawba County Foster/Adopt home is specifically approved.

2. That the placement and care of the minor child shall be the responsibility of the Catawba County Department of Social Services and the Catawba County Department of Social Services shall provide for or arrange for the foster care or other placement of the minor child.

3. That [the] Catawba County Department of Social Services shall make a reasonable effort to return the minor child to her own home.

4. That visitation between the minor child and the mother shall occur weekly and shall be supervised by the Department of

Social Services at a time and place to be determined by the Agency.

5. That the minor child shall be offered all available support services, including but not limited to foster care, physical and developmental examinations and evaluations.

6. That the mother shall comply with all aspects and terms of the Family Services Case Plan, Part A.

7. That the mother shall attend and participate in Agency-approved parenting classes, and be able to demonstrate appropriate nurturing interaction and empathy toward the minor child, and an understanding of appropriate child developmental stages as a result of such classes.

8. That the mother shall complete an assessment at Mental Health to determine her need for counseling and the need for a full psychological evaluation of the mother. The mother shall pay for the assessment and any recommended counseling. If a full psychological evaluation is necessary, the Agency shall pay for such evaluation.

9. That the mother shall cooperate fully with the Child Support Enforcement unit to determine the paternity of the minor child. The mother shall enter into a child support agreement establishing her own support payment schedule for the minor child.

10. That the identity of the minor child's father shall be determined by paternity testing. That the mother and the putative fathers shall cooperate with Child Support Enforcement Unit in arranging and participation in the paternity testing.

11. That this matter shall come on for review, without further notice to the parties, on the 17th day of August 1999.

The trial court also found that the respondent "is aware that she has a short period of time in which to turn her life around."

A review hearing was held on 24 August 1999 before Judge Einstein. At this hearing, DSS informed the court that respondent "has done everything requested by the Department of Social Services," and "the permanent plan for Patricia Eckard is reunification with her mother, Angela Eckard." DSS recommended to the trial court:

that the mother be permitted to have weekly unsupervised visits, starting with one hour unsupervised visits at the Department of Social Services, slowly progressing to unsupervised home visits, and eventually to overnight visitation dependent upon the success of the unsupervised visits as they progress to longer periods of unsupervised visitation.

The trial court made findings of fact that "the minor child continues to demonstrate a strong bond to her mother," and "[t]he child's face lights up when she sees the mother and she cries for her mother as the visit is ending." The trial court further found that:

the mother continues to cooperate with the Department of Social Services and is actively addressing the goals and objectives set forth in her Family Services Case Plan, Part A. Specifically, she is attending Mental Health counseling, Nurturing classes, regularly paying child support, has established an independent residence, and visits regularly with the child.

The court ordered, *inter alia,* that "visitation between the mother and minor child shall be unsupervised . . . [and] conducted at the Department of Social Services weekly." Finally, the court ordered "[t]hat this matter shall come on for permanency planning, without further notice to the parties, on the 16th day of November 1999."

On 16 November 1999, the matter was continued until 14 December 1999 due to the recent discovery of the identity of Patricia's natural father, Mr. Willard Sanford, Jr. At the 14 December 1999 permanency planning hearing the court heard testimony from several witnesses. The first witness was Patricia's foster mother, Mrs. Paulette Sigmon. Mrs. Sigmon testified that Patricia "had a lot of bruises" and was "very shy" when she first arrived at the Sigmon home. According to Mrs. Sigmon, Patricia did not eat or sleep well at first. Mrs. Sigmon testified that it took Patricia several months to gain the trust of her foster family, and that in time, Patricia began eating and sleeping better. Mrs. Sigmon stated that Patricia calls her "momma" or "momma Paulette," and Mr. Sigmon "daddy."

The foster father, Mr. Harry Sigmon, testified that Patricia was scared of men at first. Mr. Sigmon stated that Patricia gradually became affectionate towards him, and Patricia eventually "bloomed out like a flower." Both Mr. and Mrs. Sigmon testified that they expected to be able to adopt Patricia, despite DSS's stated goal of reunifying Patricia with respondent.

IN RE ECKARD

[144 N.C. App. 187 (2001)]

The court next heard testimony from Ms. Anne Smith, a psychologist with Catawba County Mental Health Counseling Services. Ms. Smith performed a court-ordered psychological evaluation of respondent on 20 September 1999. Ms. Smith concluded that, despite respondent's low I.Q. level, she had "no severe mental health issues that would significantly interfere with her ability to parent her child," and that "reunification between Ms. Eckard and her child should be considered." Ms. Smith testified that:

> The results that I came up with were, are based mainly on the fact that [respondent] was not the person herself who hurt the child. She has been cooperating with everything that's been asked of her. She's, it was reported to me by DSS that she's keeping all of her appointments, she's been very cooperative, she's gone to classes. She's keeping her Mental Health appointments. She expresses a real desire and motivation to, to learn parenting skills that she may not have had in the past. She expresses appreciation for the help that she's receiving. She expresses some anger towards the man that hurt her daughter but she also accepts some responsibility on her own part for not protecting her. And this is something that, in the number of evaluations that I've done, I don't often see. And I think it's a real healthy start that she is willing to accept responsibility herself. And that she's being very cooperative and learning and enjoying what she is learning.

The court next heard testimony from David Keyes, a psychologist with Catawba County Counseling Services. Mr. Keyes served as respondent's regular therapist. Mr. Keyes stated that respondent felt very "guilty . . . about leaving her child with the boyfriend and then having to return and having her be abused." In a letter addressed to DSS and presented to the court, Mr. Keyes summarized respondent's progress as follows:

> Overall, Ms. Eckard gained understanding of how and why her relationships with men are unhealthy. She was able to ascertain that the solution to her poor choices is to proceed more slowly in order to get to know someone more before advancing to an intimate or live-in relationship. She also understands that it is more important for her to consider her daughter's needs over her own needs for companionship.

Mr. Keyes added that respondent's motivation to change herself was high, and she was eager to grow and learn. Mr. Keyes testified that respondent's learning disability would not prevent her from appropri-

ately parenting Patricia. Mr. Keyes concluded that, in his experience, respondent has "already grown sufficiently to not be a danger to the child."

Ms. Nancy Pannell served as respondent's court-appointed mentor. Ms. Pannell provided transportation and supervision during visits between respondent and Patricia. Ms. Pannell testified that Patricia was always very happy to see respondent, did not cry, and there was nothing negative about the visits between mother and daughter.

Respondent testified that she did not knowingly allow Patricia to be injured by Mr. Hart. Respondent testified that the only form of corporal punishment she used on Patricia prior to the injury was a "smack" with her hand on Patricia's "butt." Respondent testified that she and Mr. Hart often fought over Mr. Hart's use of discipline on Patricia. Respondent testified that she left Mr. Hart after this incident. Respondent added that she would have left Mr. Hart earlier, but she "didn't know nowhere else to go." She also testified that she has a support network of friends at work, church, and parenting classes, as well as Ms. Pannell.

Ms. Ellen Menzies, DSS's Nurturing Program Coordinator, submitted a letter to the court summarizing respondent's performance during her court-ordered "Nurturing classes." Ms. Menzies reported that respondent had attended "each of the past 18 sessions and has consistently completed her reading and writing assignments." Although quiet and reluctant at first, Ms. Menzies wrote that respondent had

> become more open and honest about herself, her perceptions regarding her situation and in her interactions with other group members. She has been an attentive and seemingly committed group member throughout the series.

> Ms. Eckard has shown a real interest in gaining information in those areas which are considered to be the core constructs of the program. As reflected by her participation in group, she appears to have made particular progress in the areas of understanding the effect of corporal punishment and identifying alternative forms of behavior management. Typically group members have more difficulty grasping the abstract concepts presented, however, she has made an obvious gain in the area of parental empathy or identifying the needs of children. . . . Although Patricia has attended only one session, she and her mother seemed to be very

bonded and were appropriately affectionate. Ms. Eckard truly seems to value Patricia and their relationship.

Ms. Beth Peterinelli, a DSS social worker, submitted a report detailing DSS's evaluation of respondent's progress. This report informed the court that:

> Ms. Eckard continues to remain employed, pay child support, and visit her child regularly. She is currently enrolled in the Nurturing Program to gain in her confidence level and competence in child rearing skills. She has also participated in counseling. Additionally community volunteer Nancy Pannell has worked with Ms. Eckard in a supportive role.

> Ms. Eckard terminated her relationship with her former live together partner immediately upon being requested to do so by DSS when the injury was first reported. She has continued to maintain her own dwelling and has fully cooperated with DSS. She appears to have gained in her confidence level and to also have learned that it is her responsibility to protect her child.

> Ms. Eckard is somewhat limited and naive, and does tend to be concrete in her thinking. However; once she learns a concept, she is able to act on the concept. (emphasis in original)

The report also indicated that respondent "has done everything requested by [DSS]," and that respondent "is following her case plan and is exceeding minimal standards of care." DSS recommended that the permanent plan for Patricia be reunification with respondent.

Finally, the Guardian Ad Litem/Attorney Advocate/Petitioner/ Appellee ("GAL"), M. Victoria Jayne, submitted a "permanency planning report" to the court dated 13 December 1999. In that report the GAL acknowledged that respondent has done everything DSS instructed her to do. However, the GAL requested that the court find and enter an order ceasing reunification efforts between respondent and Patricia. In support of this request, the GAL wrote:

> Although the mother has continued to abide by the requests of the Department of Social Services there is no evidence made available to the Guardian Ad Litem that the mother has ever acknowledged the seriousness of the abuse inflicted on Tricia prior to the skull fracture, ever accepted personal responsibility for her abuse of Tricia, or demonstrated that she has the ability or innate desire to make independent decisions to protect Tricia

from abuse in the future. The mother has admitted to at least five (5) different intimate relationships with men in a span of two (2) years . . . In addition the Guardian Ad Litem learned from the Department of Social Services that the mother had befriended some individuals who, fooled her into giving them money and then betrayed her trust. Based on these very recent incidents the Guardian Ad Litem is not convinced that the mother is able to exercise independent judgment to protect herself, much less Tricia. . . .

The Guardian Ad Litem is convinced that any "bonding" between Tricia and her natural mother and father is due <u>solely</u> to the nurturing, safe loving atmosphere of the Sigmon home. They have taken a frail, chronically abused, frightened baby of less than 2 years old and nurtured her into a precocious, inquisitive, enthusiastic, autonomous little girl, a little girl that now shows biased affection for her "daddy" Harry Sigmon and "mama" Paulette Sigmon . . . Although the mother may be sincerely trying to change her behavior and make healthy decisions for herself, the desire and ability to protect an infant is innate, in the Guardian Ad Litem's opinion, and the Guardian Ad Litem is not at all convinced that the mother possesses this innate mothering instinct or is capable of protecting Tricia in the future. (emphasis in original)

The GAL requested the court to order that: (1) reunification efforts be ceased, (2) if respondent did not agree to release her parental rights of Patricia, then DSS shall file a petition to terminate her parental rights, (3) a "good-bye visit be scheduled between each parent and the child separately," and (4) Patricia "remain in the home of the Sigmons permanently."

On 17 December 1999, the trial court filed its "permanency planning order." The Court made several findings of fact regarding respondent's ability to parent Patricia, including:

5. Ms. Eckard testified that at the sign of the "first mark" she would protect Tricia. This is evidence of her inability to understand that protecting Patricia means never letting a mark get there in the first place. Other people easily lead her.

6. Respondent mother has complied with the Department's Service Agreement and has taken advantage of every service offered to her. She is a well-meaning woman, but the Court

doubts her long term capability of being able to parent any child without constant and ongoing assistance from professionals for a number of reasons.

\* \* \*

12. While Ms. Eckard has the desire to be a good parent, the Court believes she does not have the ability. She is gullible and naive with men and friends, to wit: her past relationships and an incident where she befriended a woman, took her into her home and then was robbed by her.

\* \* \*

14. It is a powerful privilege to parent a child, and not a right to parent when abuse comes into play. The best interest of the child must outweigh parental rights. Ms. Eckard would require the Department and/or the GAL as a watchdog forever, with no guarantees that she would [sic] form questionable relationships, which could put her daughter at risk.

Based on its findings of fact, the trial court made the following conclusions of law:

1. The Catawba County Department of Social Services has exercised reasonable efforts toward reunification of the minor child with her mother, but reunification is not in the best interest of the minor child and would be contrary to the juvenile's best interest.

2. Efforts to reunify the minor child with her mother would be inconsistent with the child's health, safety, and need for a safe permanent home within a reasonable period of time.

3. The permanent plan for Tricia should be one of adoption by her foster parents.

The court ordered that it would be in Patricia's "best interest" that "[t]he custody of the minor child shall remain with the Catawba County Department of Social Service, with placement to remain in the Sigmon home as an adoptive risk placement. Adoption with the Sigmons is the permanent plan for Tricia." Respondent appeals.

### Issue

The issues presented to this court are whether the findings of the trial court are supported by competent evidence, and whether those

findings support the court's conclusions. For the following reasons, we reverse the order of the trial court directing DSS to cease reunification efforts between respondent and Patricia.

Goals of the Juvenile Code

"The family occupies a special and highly revered place in the life of our nation and people. Thus our courts have accorded full constitutional protection to family relationships. '[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.' " *In re Webb*, 70 N.C. App. 345, 350, 320 S.E.2d 306, 309 (1984) (Becton, J. dissenting) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503-4, 52 L. Ed. 2d 531, 540, (1977)), *aff'd per curiam*, 313 N.C. 322, 327 S.E.2d 879 (1985). "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . . When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 753-54, 71 L. Ed. 2d 599, 606 (1982)).

"[O]ne of the essential aims, if not the essential aim, of the dispositional hearing and the review hearing is to reunite the parent(s) and the child, after the child has been taken from the custody of the parent(s)." *In re Shue*, 311 N.C. 586, 596, 319 S.E.2d 567, 573, *modified & aff'd*, 311 N.C. 586, 319 S.E.2d 567 (1984). G.S. § 7B-100 sets forth the purpose of the Juvenile Code:

This Subchapter shall be interpreted and construed so as to implement the following purposes and policies:

(1) To provide procedures for the hearing of juvenile cases <u>that assure fairness and equity and that protect the constitutional rights of juveniles and parents</u>;

(2) To develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family;

(3) To provide for services for the protection of juveniles by means <u>that respect both the right to family autonomy</u> and the juveniles' needs for safety, continuity, and permanence; and

(4) To provide standards for the removal, when necessary, of juveniles from their homes and <u>for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents</u>.

N.C. Gen. Stat. § 7B-100 (1999) (emphasis supplied). The Juvenile Code, including G.S. § 7B-907, applicable to permanency planning hearings, must be interpreted and construed so as to implement these goals and policies. N.C. Gen. Stat. § 7B-100.

### Standard of Review

All dispositional orders of the trial court in abuse, neglect and dependency hearings must contain findings of fact based upon the credible evidence presented at the hearing. *In re Helms*, 127 N.C. App. 505, 510-11, 491 S.E.2d 672, 676 (1997). If the trial court's findings of fact are supported by competent evidence, they are conclusive on appeal. *In re Isenhour*, 101 N.C. App. 550, 553, 400 S.E.2d 71, 73 (1991).

### Order Ceasing Reunification

The purpose of a permanency planning hearing is "to develop a plan to achieve a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-907(a) (1999). The trial court has the authority to cease reunification efforts pursuant to G.S. § 7B-507(b):

(b) In any order placing a juvenile in the custody or placement responsibility of a county department of social services, whether an order for continued nonsecure custody, a dispositional order, or a review order, the court may direct that reasonable efforts to eliminate the need for placement of the juvenile shall not be required or <u>shall cease if the court makes written findings of fact that</u>:

(1) Such efforts clearly would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time.

N.C. Gen. Stat. § 7B-507(b) (1999) (emphasis supplied). *See In re Brake*, 347 N.C. 339, 493 S.E.2d 418 (1997) (trial court has authority to order DSS to cease reunification efforts where, among other things, juvenile's mother failed to comply with previous court orders). In its permanency planning order, the trial court made the statutory findings that (1) DSS "has exercised reasonable efforts toward reunifica-

tion of the minor child with her mother, but reunification is not in the best interest of the minor child and would be contrary to the juvenile's best interest;" and (2) "[e]fforts to reunify the minor child with her mother would be inconsistent with the child's health, safety, and need for a safe, permanent home within a reasonable period of time." However, we hold that the evidence before the trial court does not support these findings.

As detailed in the recitation of the facts, every witness at the permanency planning hearing testified that respondent had done everything she was required to do by the court and DSS to be reunited with her child. Respondent (1) attended every class, (2) paid child support, (3) attended scheduled visits with Patricia, (4) acknowledged her responsibilities, (5) recognized her errors, and (6) appeared to learn from her mistakes. Respondent's psychologist, therapist, court-appointed mentor, Nurturing Program instructor, and social worker all testified that respondent had worked hard and made substantial progress towards achieving the goals outlined by the trial court and DSS. Based on its extensive evaluations by numerous psychologists and counselors, DSS recommended that reunification between respondent and Patricia remain the goal. Furthermore, there is no evidence in the record that the trial court ever found that respondent inflicted the injuries which lead to Patricia's removal from the home.

Despite overwhelming evidence of respondent's improvements, and full compliance with all provisions of the Family Services Case Plan, the trial court ordered DSS to cease reunification efforts eight months after Patricia was taken from respondent. The trial court further directed DSS to initiate parental right termination proceedings if respondent refused to relinquish her parental rights. After reviewing the transcripts and record, the only "evidence" presented at the hearing which tends to support the trial court's order is the recommendation submitted by the GAL-appellee. The trial court's findings substantially mirror GAL-appellee's recommendations. In its order, the trial court outlined certain findings of fact to support its conclusion that reunification efforts should cease: (1) respondent has had relationships with five different men in the two years preceding the hearing, (2) respondent is "gullible and naive," (3) respondent would require "ongoing assistance from professionals for a number of reasons," with "no guarantees that she would [not] form questionable relationships, which could put her daughter at risk," (4) respondent has an I.Q. "which ranks in the extremely low range," (5) "Tricia is too

**IN RE ECKARD**

[144 N.C. App. 187 (2001)]

bonded to her current placement [with the Sigmons] to risk her young and fragile well-being at this time" and (6) respondent did not do more to protect Tricia from Mr. Hart. Nevertheless, we hold that all of the above findings do not constitute sufficient evidence to support the conclusion that it is in Patricia's best interest to cease reunification efforts with her natural mother. This is particularly true in the light of the mountainous evidence presented to the trial court reaching an opposite conclusion regarding respondent's progress and parenting ability. *See In re Ballard*, 311 N.C. 708, 319 S.E.2d 227 (1984) (a prior adjudication of neglect can not be the sole basis for terminating parental rights).

At its initial review hearing, the trial court found that respondent "is aware that she has a short period of time in which to turn her life around." With the exception of GAL/appellee, every person whom the court assigned to assess respondent concluded that respondent had made substantial progress towards "turning her life around." DSS also recommended that it was in Patricia's best interest that the goal remain reunification of mother and daughter. In its permanency planning order, the trial court found that respondent "has complied with the Department's Service Agreement and has taken advantage of every service offered to her." Nonetheless, the trial court ordered DSS to cease reunification efforts, and to take steps to terminate respondent's parental rights.

Appellee's brief contains reference to matters that occurred after the 17 December 1999 order appealed from in this case. Documentation of these subsequent events are not included in the record on appeal. We do not consider any matters discussed in appellee's brief occurring after the 17 December 1999 order. *See* N.C.R. App. P. 9.

In summary, the trial court ordered that reunification cease: (1) despite finding that respondent had completed all of the services that DSS made available to respondent to put her in a position of being able to care for the child, (2) despite DSS's recommendation that reunification efforts continue due to respondent's improvements, and (3) despite the absence of any proof or finding that respondent had ever hurt Patricia. The trial court made the statutory finding that reunification efforts "would be inconsistent with the child's health, safety, and need for a safe permanent home within a reasonable period of time." However, the evidence presented to the trial court supports an opposite conclusion. *See* N.C. Gen. Stat. § 7B-507(b) (1999). Accordingly, we reverse the trial court's order and remand

this case to the trial court for further proceedings in order to enable DSS to carry out its statutory duties seeking reunification.

Reversed and remanded.

Judges WALKER and HUNTER concur.