IN RE: K.S., A MINOR JUVENILE

No. COA06-1697

(Filed 5 June 2007)

## 1. Child Abuse and Neglect— neglect—findings of fact—statutorily required findings

The trial court did not err in a child neglect case by ordering cessation of reunification efforts allegedly without the statutorily required findings, because: (1) it is permissible for trial courts to consider all written reports and materials submitted in connection with juvenile proceedings; and (2) although the trial court incorporated a DSS report, the trial court did not limit its fact finding to the contents of the DSS report but also made its own specific findings of fact with respect to several of the criteria enumerated in N.C.G.S. § 7B-907(b).

IN RE K.S.

[183 N.C. App. 315 (2007)]

**2. Child Abuse and Neglect— neglect—court's fact-finding duty—testimony—reports**

The trial court in a child neglect case did not delegate its fact-finding duty even though respondent contends that a broad reference to facts contained in outside reports coupled with conclusory statements in the order and no witness testimony whatsoever failed to sufficiently address the factors enumerated in N.C.G.S. § 7B-907, because: (1) the trial court heard testimony from a social worker assigned to the case as well as the guardian ad litem appointed to represent the minor child; (2) the trial court received into evidence a summary report submitted by DSS, a reasonable efforts report prepared by DSS, and a status report provided by the F.I.R.S.T. program coordinator; (3) the court did not merely incorporate these reports as findings, but instead paid particular attention to certain portions of those reports and based its findings in part on those reports; and (4) the trial court did not adopt DSS's summary and recommendations, and in fact, declined to follow DSS's recommendation that reunification be pursued.

**3. Child Abuse and Neglect— neglect—findings of fact—concerns about respondent's attending meetings and engaging sponsor**

The trial court did not err in a child neglect case by its finding of fact that concerns persist with respect to respondent's attending meetings and engaging her sponsor, because: (1) this finding is supported by the F.I.R.S.T. Program status report; and (2) even though the DSS summary provided contrary evidence, the trial court's finding was supported by competent evidence.

**4. Child Abuse and Neglect— neglect—findings of fact—parent ceased participating in individual therapy—domestic violence—without housing or income**

The trial court did not err in a child neglect case by its finding of fact that respondent ceased participation in individual therapy, she was involved in a domestic violence incident since the last hearing, and she does not have housing or an income, because: (1) although there is evidence in the record that defendant attended one meeting, there is also evidence supporting the trial court's finding that she ceased participating in individual therapy; (2) with respect to the domestic violence incident, respondent failed to preserve this argument as required by N.C.

R. App. P. 10(a) when she did not assign error on the basis she is now arguing; and (3) with respect to the finding that she was without housing or income, the trial court noted respondent was homeless based on the DSS summary, and the F.I.R.S.T. report noted she was homeless and without any income.

**5. Child Abuse and Neglect— neglect—findings of fact—inappropriate sexual activity—failure to exercise common sense**

The trial court did not err in a child neglect case by its finding of fact that respondent engaged in inappropriate sexual activity and failed to exercise common sense, because: (1) the trial court did not express any value judgment on fornication, but instead explained that respondent's unprotected sexual intercourse resulting in numerous unplanned pregnancies placed the minor child's welfare in jeopardy if for no other reason than straining her already limited resources including time and money; (2) the record supported the court's finding that respondent had at least three pregnancies in three years, and respondent could not name with certainty the fathers of her children; (3) although respondent contends it was not reasonable for the court to find she failed to exercise common sense when she had not been told previously by the court or DSS to refrain from unprotected sex and she has a borderline range of functioning with an IQ of 76, the trial court does not have a duty to warn against the obvious dangers of unprotected sexual activity, and a trial court is not required to alter its decision as to whether a parent is capable of providing proper care for a child based upon the parent's IQ; and (4) N.C.G.S. § 7B-1111(a)(6) expressly allows for the termination of parental rights in situations where a parent lacks adequate cognitive functioning.

**6. Appeal and Error— preservation of issues—failure to cite authority—failure to assign error**

Although respondent contends the trial court erred in a child neglect case by finding that respondent's parental rights to another child had been terminated previously, this assignment of error is dismissed because respondent cited no authority for her contentions and has not assigned error to the trial court's finding on either of her argued grounds as required by N.C. R. App. P. 28(b)(6).

**7. Child Abuse and Neglect— neglect—findings of fact—failure to comply with case plan**

The trial court did not err in a child neglect case by finding that respondent has not reasonably complied with her case plan, because although it appears that respondent complied with her case plan to the extent that it required her to undergo substance abuse treatment and domestic violence counseling, she did not comply with other aspects of her case plan including failure to participate in individual therapy and failure to secure safe housing and income.

**8. Child Abuse and Neglect— neglect—findings of fact—guardian ad litem raised concern the juvenile had R.A.D.S. due to lack of permanent placement**

The trial court erred in a child neglect case by the portion of a finding of fact stating that the guardian ad litem raised concern regarding the juvenile having R.A.D.S. (reactive attachment disorder) due to lack of permanent placement, because: (1) the guardian ad litem did not submit a report expressing such concerns; (2) the only reference to the minor child developing R.A.D.S. is the guardian ad litem attorney's statement, and statements by an attorney are not considered evidence; and (3) there is no competent evidence in the record to support the finding.

**9. Child Abuse and Neglect— neglect—conflicting orders—visitation**

Although the trial court did not err in a child neglect case by making conflicting orders with respect to respondent's visitation with the minor child in its oral order versus its written order, the case is remanded for clarification as to respondent's visitation rights, because: (1) an order entered in open court is not enforceable until it is reduced to writing, signed by the judge, and filed with the clerk of court; (2) the court's oral ruling denying visitation was not final, and the court had the authority to alter its ruling in its written order; and (3) the trial court provided in its written order that visitation was to take place according to the visitation schedule, but the record is devoid of such a visitation schedule or any other visitation plan in effect.

Appeal by respondent mother from order ceasing reunification efforts and entering a permanent plan for adoption entered 16 October 2006 by Judge Hugh B. Lewis in Mecklenburg County District Court. Heard in the Court of Appeals 30 April 2007.

*Tyrone C. Wade, for Mecklenburg County Department of Social Services, petitioner-appellee.*

*Hunton & Williams, by Jason S. Thomas, guardian ad litem attorney advocate for the minor child.*

*Richard Croutharmel, for respondent-appellant mother.*

JACKSON, Judge.

The minor child in this action, K.S., was born to Bonita S. ("respondent") in June 2004. At the time, respondent had three other children. Respondent's parental rights had been terminated as to one of these children, and another had been placed with relatives in South Carolina. A third child resided with the biological father.

In February 2005, Mecklenburg County Department of Social Services ("DSS") learned that respondent had placed K.S. with K.S.'s maternal grandmother in Catawba County. Shortly thereafter, respondent removed K.S. from the grandmother's home and moved with K.S. to Mecklenburg County, where they resided at the Salvation Army Women's Shelter. DSS also learned that respondent had a history of substance abuse and that she intended to enter substance abuse treatment. Respondent began treatment in the CASCADE program, but ceased participating in the program shortly thereafter. She also left the Women's Shelter and moved in with a friend who was recovering from substance abuse. Respondent subsequently began living in a "crack house," and returned K.S. to the maternal grandmother's home.

On 17 June 2005, DSS filed a juvenile petition alleging that K.S. was dependent and neglected on the basis that respondent was not in a position to care for K.S. and that the maternal grandmother's home was not an appropriate placement as the maternal grandmother had a prior history with Catawba County DSS. The petition further alleged that respondent was five months pregnant, was taking medications for depression and narcolepsy, and had relapsed in her substance abuse. Based on this juvenile petition, DSS was granted non-secure custody.

On 12 July 2005, the trial court adjudicated K.S. dependent and neglected and entered a disposition order with a plan for reunification with respondent and ordering respondent (1) to complete a parenting capacity evaluation and follow any recommendations; (2) to follow any treatment recommendations made by Families in Recov-

ery to Stay Together ("F.I.R.S.T."); (3) to participate in random drug screens; and (4) to remain drug and alcohol free. The trial court found that the issues that must be resolved to achieve reunification included respondent's substance abuse, her ability to provide for the needs of the child, unstable housing and employment, and lack of parenting skills. The trial court also noted that the F.I.R.S.T. assessment reported that respondent was receiving substance abuse and mental health treatment and recommended that respondent seek domestic violence counseling as well.

At a review hearing on 29 September 2005, DSS reported that respondent was residing at the CASCADE treatment center and was eight months pregnant. DSS further reported that respondent was appropriate with K.S. during visitation and that she and K.S. were bonding well. In its order, the trial court ruled that respondent needed (1) to complete a parental capacity evaluation; (2) to continue to visit with K.S.; (3) to cooperate with the F.I.R.S.T. program; (4) to provide information about K.S.'s father so that he could have a background check and be included in the case plan; and (5) to obtain housing and employment. The trial court continued the plan of reunification, gave DSS authority to expand visitation, and concluded that termination of parental rights was not in the best interest of K.S.

In October 2005, respondent gave birth to C.S. Both respondent and C.S. tested negative for drugs at birth, and C.S. was permitted to reside with respondent at CASCADE's residential treatment facility.

In its report for a review hearing on 8 June 2006, DSS reported that respondent had missed multiple meetings at CASCADE without excuse, had missed one domestic violence program meeting, and had stopped attending therapy sessions. While respondent had become employed through a temporary agency, she lost the job when she was unable to make care arrangements for C.S. DSS reported that respondent had not gained the level of independence that CASCADE had hoped for, but respondent was expected to move to Hope Haven at the end of the month where she would be taught "basic living skills such as budgeting, grocery shopping, etc." Finally, DSS expressed concerns about respondent's truthfulness after receiving conflicting reports about the circumstances of a new pregnancy. Because respondent had not made sufficient progress to permit K.S. to be returned after almost a full year, DSS recommended that the trial court adopt a concurrent plan of adoption.

**IN RE K.S.**

[183 N.C. App. 315 (2007)]

In its order from the 8 June 2006 review hearing, the trial court noted that respondent had been sober for eleven months, but had not completed either the domestic violence or therapy component of her case plan. Notwithstanding DSS's recommendation that the trial court adopt a concurrent plan of adoption, the trial court maintained the status quo of the case.

At a permanency planning hearing on 21 September 2006, the trial court reviewed a summary report from the F.I.R.S.T. Program coordinator, in which the coordinator stated that respondent had been clean for 434 consecutive days, had completed treatment, and was in transition with housing. The coordinator, however, expressed concerns about respondent's "meeting the required amount of NA/AA [meetings] as well as her engagement with a sponsor." DSS in its report noted that respondent had made progress towards sobriety, had successfully completed the domestic violence program, and had acknowledged that she had made poor decisions in the past. DSS also reported that since the last review hearing, respondent had missed only one F.I.R.S.T. meeting and that the absence had been excused. DSS further noted that respondent had moved to Hope Haven and "did a good job actively participating," but due to respondent's high risk pregnancy and a work limitation placed upon her by her doctor, respondent was unable to work the necessary eight hours per day to cover her rent. As a result, respondent left Hope Haven and moved to the Salvation Army Shelter with C.S. Two weeks later, respondent was transferred to the Battered Women's Shelter after a domestic violence episode with her ex-boyfriend, and on 5 September 2006, respondent moved from the Battered Women's Shelter to the home of a community advocate.

Although DSS previously had recommended a concurrent plan of adoption, DSS now recommended that the plan of reunification be continued. Notwithstanding DSS's recommendation, the trial court ordered that the permanent plan be changed from reunification to adoption and termination of parental rights, and the court ordered DSS to file a termination petition. Respondent appeals from this permanency planning order.

[1] In her first assignment of error, respondent asserts that (1) the trial court's order ceasing reunification efforts does not contain the statutorily required findings; and (2) the findings made by the trial court are not supported by the evidence.

Pursuant to North Carolina General Statutes, section 7B-907(b),

[a]t the conclusion of the [permanency planning review] hearing, if the juvenile is not returned home, the court shall consider the following criteria and make written findings regarding those that are relevant:

(1) Whether it is possible for the juvenile to be returned home immediately or within the next six months, and if not, why it is not in the juvenile's best interests to return home;

(2) Where the juvenile's return home is unlikely within six months, whether legal guardianship or custody with a relative or some other suitable person should be established, and if so, the rights and responsibilities which should remain with the parents;

(3) Where the juvenile's return home is unlikely within six months, whether adoption should be pursued and if so, any barriers to the juvenile's adoption;

(4) Where the juvenile's return home is unlikely within six months, whether the juvenile should remain in the current placement or be placed in another permanent living arrangement and why;

(5) Whether the county department of social services has since the initial permanency plan hearing made reasonable efforts to implement the permanent plan for the juvenile;

(6) Any other criteria the court deems necessary.

N.C. Gen. Stat. § 7B-907(b) (2005). This Court has held that it is reversible error for the trial court to enter a permanency planning order that continues custody with DSS without making proper findings as to the relevant statutory criteria. *See, e.g., In re J.S.*, 165 N.C. App. 509, 598 S.E.2d 658 (2004). Additionally, the "findings of fact must be 'sufficiently specific to enable an appellate court to review the decision and test the correctness of the judgment.' " *Id.* at 511, 598 S.E.2d at 660 (quoting *Quick v. Quick*, 305 N.C. 446, 451, 290 S.E.2d 653, 657 (1982)).

In *J.S.*, this Court found that the trial court failed to comply with section 7B-907(b) when "the trial court entered a cursory two page order" and "did not incorporate any prior orders or findings of fact from those orders. Instead, the trial court incorporated a court report

IN RE K.S.

[183 N.C. App. 315 (2007)]

from DSS and a mental health report . . . as a finding of fact." *Id.* Much as in *J.S.*, the trial court in the case *sub judice* incorporated a DSS report, and as this Court stated, "it is permissible for trial courts to consider all written reports and materials submitted in connection with [juvenile] proceedings." *Id.* Unlike *J.S.*, however, the trial court did not limit its fact-finding to the contents of the DSS report but also made its own, specific findings of fact with respect to several[1] of the criteria enumerated in section 7B-907(b). Accordingly, to the extent that respondent argues that the trial court did not follow the statutory mandate provided in section 7B-907(b), respondent's assignment of error is overruled.

[2] Respondent also asserts that the trial court's findings of fact are not supported by competent evidence. "All dispositional orders of the trial court in abuse, neglect and dependency hearings must contain findings of fact based upon the credible evidence presented at the hearing." *In re Eckard*, 144 N.C. App. 187, 197, 547 S.E.2d 835, 841 (citations omitted), *remanded on other grounds*, 354 N.C. 362, 556 S.E.2d 299 (2001). As this Court has clarified, "[w]here the trial court's findings are supported by competent evidence, they are binding on appeal, *even if there is evidence which would support a finding to the contrary.*" *J.S.*, 165 N.C. App. at 511, 598 S.E.2d at 660 (emphasis added). Where a trial court's findings are not supported by competent evidence, however, this Court will reverse a trial court's permanency planning order. *See, e.g., In re D.L.*, 166 N.C. App. 574, 584-85, 603 S.E.2d 376, 383 (2004).

In the case *sub judice*, respondent correctly notes that the guardian *ad litem* did not submit a report, respondent did not testify on her own behalf, and the parenting capacity evaluation report referenced by the attorney for the guardian *ad litem* was not proffered as evidence. Additionally, the bulk of the hearing was devoted to arguments presented by respondent's attorney, DSS's attorney, and the attorney for the guardian *ad litem*, and it is well-established that "[s]tatements by an attorney are not considered evidence." *Id.* at 582, 603 S.E.2d at 382 (citing *State v. Haislip*, 79 N.C. App. 656, 658, 339 S.E.2d 832, 834 (1986)). Consequently, respondent contends that the trial court erred because "[a] broad reference to facts contained in outside reports coupled with conclusory statements in the order and no witness testimony whatsoever fails to sufficiently address the factors enumerated in N.C. Gen. Stat. § 7B-907."

---

1. This Court has noted that the trial court is not required to make every finding listed under section 7B-907(b). *See J.S.*, 165 N.C. App. at 512, 598 S.E.2d at 660.

**IN RE K.S.**

[183 N.C. App. 315 (2007)]

However, the trial court heard testimony from Roslyn Jones, a social worker assigned to the case, as well as Cynthia Janeiro-Elke, the guardian *ad litem* appointed to represent K.S.[2] The trial court also received the following items into evidence: a summary report submitted by DSS, a reasonable efforts report prepared by DSS, and a status report provided by the F.I.R.S.T. program coordinator. The court did not merely incorporate these reports as findings; rather, the court paid particular attention to certain portions of those reports and based its findings of fact in part on those reports. For example, the trial court explained:

> The Court is going to accept the [DSS] Court Summary, the first [sic] report, reasonable efforts report. The Court wants to draw specific attention to the last paragraph of the family history relative to the number of the [sic] pregnancies that the mother in this matter has had.

Additionally, and contrary to respondent's contentions, the trial court did not adopt lock-stock-and-barrel DSS's summary and recommendations. Indeed, the trial court declined to follow DSS's recommendation that reunification be pursued, and "North Carolina caselaw is replete with situations where the trial court declines to follow a DSS recommendation." *In re Rholetter*, 162 N.C. App. 653, 664, 592 S.E.2d 237, 244 (2004). In sum, the trial court did not merely recite allegations or broadly incorporate DSS's reports, and the trial court did not use the DSS report "as a substitute for its own independent review." *In re M.R.D.C.*, 166 N.C. App. 693, 698, 603 S.E.2d 890, 893 (2004), *disc. rev. denied*, 359 N.C. 321, 611 S.E.2d 413 (2005). Accordingly, we decline to hold that the trial court improperly delegated its fact-finding duty.

[3] With respect to the particular findings challenged on appeal, respondent first contends that the trial court's finding of fact number 2 is not supported by competent evidence. Specifically, respondent challenges the court's finding that concerns persist with respect to respondent's attending meetings and engaging her sponsor. This finding, however, is supported by the F.I.R.S.T. Program status report, in which the case coordinator noted, "We do have concerns [with respondent] meeting the required number of NA/AA [meetings] as well as her engagement with a sponsor." The DSS summary, however, noted that "[s]ince the last Court Hearing, [respondent] has missed

---

2. Respondent incorrectly asserts in her brief that "[t]he GAL was not in court for the permanency planning hearing."

one meeting" and that her absence had been excused. Nevertheless, the trial court's finding is supported by competent evidence, even though "there is evidence which would support a finding to the contrary." *J.S.*, 165 N.C. App. at 511, 598 S.E.2d at 660.

**[4]** Respondent next challenges finding of fact number 3, wherein the trial court found that "[respondent] ceased participation in individual therapy. She was involved in a domestic violence incident since the last hearing. She does not have housing nor [sic] income." Once again, this finding is supported by competent evidence.

First, DSS noted in its summary that respondent "was participating in individual therapy with Ms. Tamara Baldwin [at] BHC, but she stopped going." Although respondent attended an intake appointment on 15 September 2006, she did so only after the therapist "explained to her the importance of her participating in individual therapy to help her address some of [the] issues that she continues to struggle with." Thus, although there is evidence in the record that respondent attended one meeting, there also is evidence supporting the trial court's finding that she ceased participating in individual therapy.

With respect to the domestic violence incident, the DSS summary notes that respondent "was transferred to the Battered Women Shelter after she had a [domestic violence] episode with her ex-boyfriend . . . . [Respondent] went to Victim's Assistance [and] took out a [restraining order] on him." Respondent does not dispute that she was involved in a domestic violence incident. Rather, respondent contends that (1) she was the victim in the incident; (2) "we cannot pick and choose when we are going to be victims of crime"; and (3) she responded appropriately to the incident by relocating and obtaining a restraining order. As such, respondent does not challenge the particular finding itself but rather whether this finding supports the court's conclusion that returning custody of K.S. to respondent would not be in K.S.'s best interest. Respondent, however, did not assign error on this basis, and this Court's review is limited to the assignments of error set out in the record on appeal. *See* N.C. R. App. P. 10(a) (2006). Thus, respondent has failed to preserve this argument for appellate review.

Respondent further challenges the court's finding that she was without housing or income. The trial court correctly found that respondent is homeless based on the DSS summary reporting that after moving out of the Salvation Army Shelter and then the Battered Women's Shelter, respondent moved in with a community advocate

while awaiting placement with Florence Crittenton Services. The F.I.R.S.T. report also noted that respondent had not secured housing but rather was "in transition [with] housing." Additionally, since moving out of Hope Haven, respondent has not had a job or any income with which to support her children and herself. Once again, respondent's assignment of error only challenges the finding on the ground that it is unsupported by competent evidence. Respondent's assignment of error does not challenge whether the finding was used improperly to support the court's conclusions, which respondent argues in her brief, and thus, respondent has waived this argument. *See id.*

**[5]** Respondent next challenges finding of fact number 4, in which the trial court found:

> It is not possible for the juvenile(s) to be returned home immediately or within the next 6 months nor is it in the juvenile(s)' best interest to return home because: [Respondent] exhibits an inability to refrain from inappropriate sexual activity. She has had at least 3 pregnancies in 3 years. She continues to exhibit poor decision-making. [Respondent's] parental rights have been terminated to another child. She has two other children not in her custody. [Respondent] has not reasonably complied with her case plan.

Respondent takes particular issue with the court's finding that she engaged in "inappropriate sexual activity." In her brief, she implies that the trial court harbored "political motivations," which she characterized as a personal disdain for "fornication," and that the trial court improperly condemned her based upon the court's own set of values. We find such argument to be without merit.

First, this Court previously has employed terminology similar to that used in finding of fact number 4. *See, e.g., In re Guynn*, 113 N.C. App. 114, 119, 437 S.E.2d 532, 535 (1992) (noting that "the mother is incapable of properly caring for and supervising the child" as a result of, *inter alia, "inappropriate sexual relationships"* (emphasis added)). Second, the record is clear as to what the trial court meant by "inappropriate sexual activity." At the permanency planning hearing, the trial court stated,

> I'm going to state [sic] myself out and probably be very politically incorrect here. I make a specific finding of fact that this mother

has not exhibited common sense when it comes to motherhood or being pregnant or her sexual activity. She has exhibited that history throughout this case plan. I have nothing that convinces me that she won't continue that process. And that means that every child she ever has is going to be put in jeopardy. . . . Based on the mother's inability to refrain from having unprotected sexual intercourse that continually gets her pregnant, she's not going to—this child is not going be able to be returned home immediately or within the next six months. And it's not in the juvenile's best interest to return home.

The trial court did not express any value judgment on "fornication," but rather, the court properly explained that respondent's unprotected sexual intercourse resulting in numerous unplanned pregnancies placed K.S.'s welfare in jeopardy, if for no other reason than straining her already limited resources, including the time and money she could devote to caring for K.S. The record fully supports the court's finding that respondent "had at least 3 pregnancies in 3 years," and respondent could not name with certainty the fathers of her children. The court's finding that respondent engaged in "inappropriate sexual activity" is supported by competent evidence, and this finding, in turn, supports the trial court's finding that respondent had exercised poor decision-making and had failed to exercise common sense with respect to sexual activity.

Respondent, however, claims "[i]t was not reasonable for the trial court to have found that [respondent] failed to exercise common sense," because (1) she had not been told previously by the court or DSS to refrain from unprotected sex; and (2) she has a "borderline range of functioning" with an IQ of 76. We decline, however, to impose a duty on trial courts to warn against the obvious dangers of unprotected sexual activity, and furthermore, a trial court is not required to alter its decision as to whether a parent is capable of providing proper care for a child based upon the parent's IQ. In fact, North Carolina General Statutes, section 7B-1111(a)(6) expressly allows for the termination of parental rights in situations where a parent lacks adequate cognitive functioning. *See* N.C. Gen. Stat. § 7B-1111(a)(6) (2005) (providing that parental rights may be terminated if "the parent is incapable of providing for the proper care and supervision of the juvenile" and "[i]ncapability under this subdivision may be the result of . . . mental retardation, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile."). In sum,

respondent cannot use her purported IQ of 76 as a shield against the trial court's finding that she failed to exercise common sense.

**[6]** Next, respondent contends that the trial court erred in finding that respondent's parental rights to another child had been terminated previously. Respondent does not dispute the truth of the finding, but instead, contends that (1) the trial court had not been concerned with this prior termination in any of its hearings leading up to the permanency planning hearing at which reunification efforts were ceased, and thus, the court made the finding "at the last second to justify [its] decision"; and (2) the trial court should have been required to find that respondent was unwilling or unable to establish a safe home because, although section 7B-507(b) does not require such a finding, "to ignore this component at the cease reunification efforts stage is incongruent" with section 7B-1111(a)(9), pursuant to which such a finding is required to terminate parental rights. Respondent, however, has cited no authority for her contentions and has not assigned error to the trial court's finding on either of these grounds. *See* N.C. R. App. P. 28(b)(6) (2006); N.C. R. App. P. 10(a) (2006). As such, we decline to review her arguments.

**[7]** Respondent further contends that the trial court erred in finding that she "has not reasonably complied with her case plan." On 18 July 2005, the trial court ordered respondent to

> participate in a screening and assessment to be conducted by staff of the Mecklenburg County F.I.R.S.T. Program. [Respondent] shall also comply with all recommendations made to them for substance abuse/mental health/domestic violence treatment, participate in random drug screens and remain drug and alcohol free.

The trial court also adopted DSS's "Out of Home Family Services Agreement," pursuant to which respondent was required to "obtain appropriate [and safe] housing [and] income."

Respondent participated in the F.I.R.S.T. screening and assessment, and the F.I.R.S.T. Program case coordinator consistently reported that respondent was in substantial compliance with the program. DSS also reported that respondent had successfully completed the domestic violence program.

Although it appears that respondent complied with her case plan to the extent that it required her to undergo substance abuse treatment and domestic violence counseling, she did not comply with

other aspects of her case plan. First, the trial court found that "[respondent] ceased participation in individual therapy," and as discussed *supra*, this finding of fact was supported by competent evidence. Second, respondent failed to comply with her case plan to the extent it required her to secure safe housing and income. On 10 July 2006, the court reiterated the requirement that respondent was to "obtain appropriate housing and income" in order for reunification to remain the goal. At the permanency planning hearing, over fourteen months after the trial court adopted the signed "Out of Home Family Services Agreement" in which respondent agreed to obtain safe housing and income, the trial court found that respondent still had not secured housing or employment. As discussed *supra*, this finding is supported by competent evidence, and thus, the trial court's finding that respondent had not reasonably complied with her case plan is supported by competent evidence. Accordingly, respondent's argument is overruled.

[8] In her final argument with respect to the trial court's findings of fact, respondent disputes the portion of finding of fact number 15 in which the trial court noted that "[t]he GAL raised concern regarding the juvenile having R.A.D.S. due to lack of permanent placement." Specifically, respondent contends (1) that there is no evidence in the record to establish what the trial court meant by "R.A.D.S."; and (2) "[r]egardless of what [it] mean[s], there is no evidence in the record to support such a concern." Although the trial court may have meant "reactive attachment disorder,"[3] respondent is correct that the only reference to K.S. developing "R.A.D." or "R.A.D.S." is the guardian *ad litem* attorney's statement that "we are setting this child up to become a RAD child where she's going to have some significant attachment issues." The guardian *ad litem*, however, did not submit a report expressing such concerns, and as discussed *supra*, "[s]tatements by an attorney are not considered evidence." *D.L.*, 166 N.C.

---

3. *See, e.g.*, Neil W. Boris, et al., Am. Acad. Child & Adolescent Psychiatry, *Practice Parameter for the Assessment and Treatment of Children and Adolescents with Reactive Attachment Disorder of Infancy and Early Childhood* 2, (2005), *available at* http://www.aacap.org/galleries/PracticeParameters/rad.pdf (last visited Apr. 9, 2007) ("Reactive Attachment Disorder (RAD) is the clinical disorder that defines distinctive patterns of aberrant behavior in young children who have been maltreated or raised in environments that limit opportunities to form selective attachments."); *see also In re Gray*, No. COA01-1216, 2002 N.C. App. LEXIS 2278, at *13 (N.C. Ct. App. Sept. 3, 2002) ("[A] mental health therapist testified that the oldest child suffers from a reactive attachment disorder which is a developmental disorder that is acquired when a child is not able to form an attachment or bond with a primary caregiver in the first two years of their life.").

App. at 582, 603 S.E.2d at 382 (citation omitted). As there is no competent evidence in the record to support the trial court's finding regarding R.A.D.S., the trial court erred in making such a finding.

Nevertheless, the remaining findings of fact upheld by this Court, including respondent's failure to secure housing or income, are sufficient to support the trial court's conclusion that returning K.S. to respondent would be contrary to K.S.'s best interest and that reasonable efforts to reunify should be suspended. *See In re J.C.S.*, 164 N.C. App. 96, 106, 595 S.E.2d 155, 161 (2004) ("Appellate review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and the findings support the conclusions of law.").

**[9]** In her second assignment of error, respondent contends that the trial court made conflicting orders with respect to her visitation with K.S. Specifically, during the permanency planning hearing, the trial court ruled that "[a]ll visits . . . are ceased." In its written order, however, the trial court provided that visitation between respondent and K.S. was to continue "contingent upon [respondent's] progress and compliance with [the] case plan" and that visitation was to take place "[a]ccording to the visitation schedule."

It is well-established that "an order rendered in open court is not enforceable until it is 'entered,' *i.e.*, until it is reduced to writing, signed by the judge, and filed with the clerk of court." *In re L.L.*, 172 N.C. App. 689, 698, 616 S.E.2d 392, 397 (2005) (internal quotation marks and citations omitted); *see also State v. Gary*, 132 N.C. App. 40, 42, 510 S.E.2d 387, 388, *cert. denied*, 350 N.C. 312, 535 S.E.2d 35 (1999). Thus, the trial court's oral ruling denying visitation was not final, and the court had the authority to alter its ruling in its written order.

Nevertheless, we must remand this case for clarification as to respondent's visitation rights. The trial court provided in its order that visitation was to take place "[a]ccording to the visitation schedule," but the record is devoid of such a visitation schedule or any other visitation plan in effect. As this Court has explained,

> [a]n appropriate visitation plan must provide for a minimum outline of visitation, such as the time, place, and conditions under which visitation may be exercised. The trial court may also in its order, however, grant some "good faith" discretion to the person in whose custody the child is placed to suspend visitation if such visitation is detrimental to the child.

*In re E.C.*, 174 N.C. App. 517, 523, 621 S.E.2d 647, 652 (2005) (internal citation omitted). DSS, therefore, must submit a visitation plan to the court for approval. *See In re D.S.A.*, 181 N.C. App. 715, 721, 641 S.E.2d 18, 23 (2007). Accordingly, this case must be remanded for clarification of respondent's visitation rights.

Affirmed in part; Remanded in part.

Judges STEPHENS and STROUD.

